**JOHN DOUGLAS CO. v. CABIRAC et al.**

No. 16260.

Court of Appeal of Louisiana. Orleans.

Nov. 4, 1936.

382

A. J. O'Keefe, Jr., and Leon F. Davison, both of New Orleans, for appellant.

Deutsch & Kerrigan & Burke, of New Orleans, for appellees.

JANVIER, Judge.

The John Douglas Company, a corporation of Cincinnati, Ohio, is engaged in the manufacture and sale of plumbing fixtures and supplies. H. A. Cabirac, doing business under the trade name "Cabirac Plumbing and Heating," is a plumbing contractor in New Orleans. Cabirac obtained the contract for the plumbing work in the gymnasium of Tulane University, and purchased certain necessary plumbing fixtures from the Douglas Company. On September 1, 1933, the building was accepted by the architect, but, about 1½ months thereafter, it became apparent that there were defects in certain of those fixtures resulting from corrosion of the external chromium plating, and, since final payment had not been made by the owners, there was retained a sufficient amount to replace the defective fixtures if that should prove to be necessary. Thereupon the Douglas Company took the necessary steps to record its lien upon the said work and then filed this suit, seeking solidary judgment against Cabirac, Continental Casualty Company, the surety on Cabirac's bond, and "The Administrators of the Tulane Educational Fund," which was alleged to be the name of the corporation for which the gymnasium had been constructed.

The amount claimed by the Douglas Company is $483.84, which is alleged to be the balance due, together with $10, which is alleged to be the cost of recording the lien, and the Douglas Company claims 10 per cent. as attorney's fees, to which it alleges it is entitled because of the application of Act No. 225 of 1918. Later plaintiff dismissed the suit as against the owners and proceeded with the trial of the suit as against the plumbing contractor and his surety.

The two said defendants admit that the fixtures were purchased from the Douglas Company, but they contend that they were not fit for the purpose for which they were intended because of inherent defects which resulted in the corrosion of the chromium plate on the surface almost immediately after the acceptance of the work. They maintain that the claim of plaintiff should be reduced by the amount which it will be necessary to expend in replating such of the fixtures as are defective and Cabirac also maintains that he is entitled to a credit of $25.48, which he alleges he expended for freight charges on certain of the said fixtures and which said charges should have been remitted to him by plaintiff.

In the court below there was judgment in favor of both defendants dismissing plaintiff's suit. Plaintiff has appealed, and defendants concede that the suit should not have been dismissed entirely, but that plaintiff should have been given judgment for the difference between the amount of his claim and the cost of replating said fixtures.

The evidence shows, and, in fact, it is conceded, that the fixtures are defective and that the defects became apparent very shortly after the acceptance of the work. But it is the theory of plaintiff that the said corrosion resulted from the careless spilling of acid on the said fixtures by workmen engaged nearby in completing other parts of the building.

Defendants maintain, on the contrary, that the defects resulted from inherent fault in manufacture. The evidence shows that other fixtures, supposedly of similar construction and of similar finish, were purchased from other manufacturers and were used in the same building very near to those which had been furnished by plaintiff, and that, although practically all of the fixtures furnished by plaintiff showed corrosion, only one or two small parts furnished by other manufacturers showed such defects. In view of the fact that all of these fixtures, as we have said, were used in close proximity to the others, it seems strange that, if acid were spilled, it should have been spilled only on those furnished by plaintiff company. The evidence further shows that the acid to which plaintiffs refer was used by the tile contractor, and it is shown that before he commenced his work, all fixtures were completely coated with vaseline, which, it is conceded, is the proper method of protecting such fixtures and supplies from acid which may be used nearby, and it also appears that even prior to the time at which the tile

contractor commenced his work and coated the fixtures with vaseline, they had already been coated with a similar covering, and that, therefore, when the acid was used, the fixtures had twice been covered with vaseline, which should have afforded a complete protection, even had any of the acid been dropped upon them.

Then, too, it is shown that the fixtures furnished by plaintiff company and used in parts of the building in which there was no tile installation and in which, consequently, no acid had been used, showed defects identical with those used in the other portions in which acid had been employed. As additional evidence of the fact that the corrosion was not caused by the spilling of acid after the ·installation, defendants show that in one case one of the fixtures was taken apart and a portion of pipe on the interior showed the same defect resulting from corrosion as was exhibited by the other fixtures furnished by plaintiff. It appears that this particular piece of pipe was not only inside of a larger fixture, but was so entirely cut off from the outside that it was not possible for acid to have entered and caused the defect.

There is considerable testimony in the record given by expert chemists and the opinion of some is that the corrosion is due to acid, whereas the opinion of others is that it was due to an inherent defect in manufacture. All of the chemists agree that in the manufacture of chromium-plated ware it is advisable that the fixture be made out of brass and then coated with a plating of nickel and that the chromium plate be applied over the nickel and that, if chromium is applied directly to the brass, corrosion will take place much more quickly than if the nickel is plated on the brass before the chromium is applied. One of the chemists made a complete test of one of the fixtures supplied by plaintiff company and testified positively that there was no intermediate plate of nickel between the base brass and the exterior chromium plate and no attempt to prove the contrary was made.

■ We conclude that the defects which appeared shortly after the installation of the fixtures resulted from inherent fault in manufacture and not from the careless spilling of acid after installation. The owner, therefore, was within its rights in rejecting said fixtures, or in insisting that a sufficient amount be withheld to repair the defects.

It is therefore evident that plaintiff is not entitled to the full amount which would have been due had the fixtures not been defective. Defendants, had the owner insisted upon .it, might have rejected the defective parts entirely, but instead they have merely been required to withhold an amount sufficient to replate the defective fixtures, and the evidence shows that that amount will be $225, of which $150 will be necessary for the replating and $75 for the removal and subsequent replacing of the fixtures.

■ The plaintiff contends that in no event can defendants be permitted to withhold as much as $225 for the reason, so plaintiff alleges, that in the answer of the surety it was claimed that $100 would be necessary to do the work of replating. But we do not so read the surety's answer. On the contrary, that answer states that "the cost of repairing or replacing this defective material would be in excess of $100.-00," and we find in the answer of principal defendant, Cabirac, an allegation to the effect "that the cost of repairing and replacing this defective material * * * would be in excess of the amount now claimed of this defendant by petitioner," and we also find that the said Cabirac "does now claim reimbursement from plaintiff of any sum which may be expended on said replacement in excess of the balance due under said contract."

We conclude, therefore, that the defendants have not limited their right to reduce plaintiff's claim by only the sum of $100 and that they are entitled to a reduction in the full amount which will be required to repair the defects.

It further appears that Cabirac paid freight charges amounting to $25.48, which charges were due by the plaintiff corporation, and which, no doubt, would have been paid by that company had not this controversy arisen. Cabirac is clearly entitled to a further credit in this amount. The judgment, must, therefore, be reversed, and plaintiff given credit for the difference between the contract price of the materials and the credit to which Cabirac is entitled..

■ But plaintiff's claim for attorney's fees cannot be allowed. Act No. 225 of 1918, which provides for attorney's fees in certain cases of this kind, permits the recovery of such fees only where the full amount sued for is recovered. In Templeman Bros., Inc. v. Merritt, Chapman & Williams Corp. et al., 176 La. 975, 147 So.

51, 52, in which a similar claim was made, the Supreme Court said: "As the recovery in this case was less than the amount demanded by plaintiff before suit, plaintiff is not entitled to an attorney's fee. Act No. 225 of 1918."

Plaintiff is entitled to the cost of recording its lien.

We are urged by counsel for defendants to require that plaintiff pay all costs, but we believe that plaintiff should be required to pay only the costs of appeal and that defendants should pay the costs in the district court.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be, and it is, annulled, avoided, and reversed, and that there now be judgment in favor of plaintiff, the John Douglas Company, and against H. A. Cabirac and Continental Casualty, in the full sum of $493.-84, subject to a credit of $250.48, with legal interest from judicial demand, plaintiff to pay costs of appeal and defendants to pay all costs in the district court.

Reversed.